Reese, J.
delivered the opinion of the court.
John Keaton resided for many years in the county of Franklin, in this State. In the spring of 1825, he went to the State of Missouri, taking with him eighteen or twenty slaves. They constituted .nearly the whole of his personal estate. He left behind him, however, his family and his household effects. He seems to have *236 employed his slaves, and to have occupied himself, in the State to which he had went, in the mining business, and had there a partner in conducting his operations. He paid a visit or two to his family after he left; but what were his intentions as to their future residence, does not appear. He died in the State of Missouri, in the fall of 1826. A few days after his death, the court of probate of the county of Jefferson, in that State, granted administration ad colligendum to one Michael Taney, who was a partner, who entered into bond in that character. A few days after this, administration on the estate was granted by the same court of probate to Taney, who gave the usual administrator’s bond, and was duly qualified. A list of the property was made by appraisers, including IS' slaves, and duly returned to the court of probate. On the 2d October, 1826, an additional appraised inventory was returned, consisting of two more negroes. And on the 3d October there was a sale of a portion of the personal property. Afterwards, on the 8th October, the widow of the deceased, residing in Franklin county, Tennessee, gave to William Keaton, a power of attorney, under seal, to attend to her interests in Missouri; and on the 23d of that month, he applied to the probate court of Jefferson county, in that State, for administration of John Keaton’s estate, “in virtue of his being of kin to said deceased, and, also, because- he was accreditor of the estate of the deceased,” and before its determination, the county court of Franklin county, in the State of Tennessee, on the 27th November, 1826, granted administration on the estate of John Keaton, to the same William Keaton, who entered into bond, with the defendants as his security. And such proceedings were had in the case before the probate court in Missouri, that on the 15th of March, 1827, the letters of administration to Taney were revoked, and letters of administration de bonis non, were granted to Keaton, on his giving surety, which he did, and was qualified. Keaton af-terwards brought the slaves to Tennessee, hired them out for a year or two, made return of their hire to the county court of Franklin ; sold them all at length, or pretended to do so, became the purchaser of most of them himself, returned the amount in the account of the sales to the county court, and finally, with the negroes, removed to the State of Missouri.
The distributees of John Keaton, file this bill against Campbell and Bradford, the sureties in the Tennessee bond, for the value of these negroes. And whether, under the circumstances stated, they *237 are liable, is the question before the court. This question has been argued, on both sides, with much learning and ability. It is one of the first impression among us; and feeling, sensibly, its magnitude and importance, we have bestowed upon it, an attentive and anxious consideration. The people of the United States, constituting one integral government for some purposes, are yet, for other purposes, a community of nations, so to speak, essentially distinct, and even foreign from each other. In this latter relation, they exist as to the comprehensive and highly important interests, founded upon the distribution of personal • estate; while, at the same time, the internal commerce, social intercourse, frequent changes, and mub implications of domicil, and all the varied and widely ramifiéd relations and connexions of a prosperous, enterprising and homogeneous people, create rights and interests, as to personal property, seldom to be limited, in the case of any individual of ordinary wealth, to the single State in which he may at the time reside. This state of things, while it calls upon the judicial tribunals of all the States for the reciprocal exercise of a liberal comity, admonishes us, to approach with caution, and touch with delicacy, such a question as that, which the record presents. The case before us, in allegation and proof, was obviously prepared, upon both sides, upon the sup- j position, that the decree to be given would turn upon the question ( of domicil, and as a consequence of that, upon the question, as to) which administration was principal, and which ancillary, and the I argument has proceeded, but in a much slighter degree, upon the same ground. For the Missouri administration, it has been said, there lived, and, for nearly two years had lived the intestate; there he died, there were his slaves, constituting by far the greater portion of his property; and there too, was the first administration in point of time! As to the Tennessee administration, it has been said, here had long been his home, here remained his family, and' his household furniture and effects. The pretensions- of each are-plausible, and not unequally balanced. The domicil, in the absence of any proof as to the animus of the intestate, and as presented in the record, was probably in Franklin county in this State. But, under all the circumstances shown in this case, it may be said, that j if ever there were two administrations, in different jurisdictions, | entirely distinct and independent of each other, they are the administrations stated upon this record.
*238 Upon the subject of principal and ancillary administrations, Justice Story, in his very able and elaborate judgment in the case of Harvey vs. Richards, 1 Mason’s Rep. 415, says, “I have no objection to the use of the terms principal and ancillary, as indicating a distinction in fact as to the object of the different administrations; but we should guard ourselves against the conclusion, that, therefore, there is a distinction in law as to the right of parties. There is no magic in words. Each of these administrations may be properly considered as a principal one, with reference to the limits of its exclusive authority, and each might, under circumstances, justly be deemed an ancillary administration. If the bulk of the property, and all the heirs and legatees and creditors were here, and the foreign administration were to receive a few inconsiderable claims, that would most correctly be denominated a mere ancillary administration for the beneficial use of the , parties here, although the domicil of the testator .were abroad. The converse case, would, of course, produce an opposite result. But I am yet to learn what possible difference it can make in the rights of the parties before the court, whether the administration be a principal or an ancillary administration. They must stand upon the authority of the law to administer ordinary relief, under all the circumstances of their case, and not upon a mere technical distinction of very recent origin.”
This is said, in a case, too, where the American administration was, in point of form, as well as in qbject, ancillary; for the do-micil was at Calcutta,and a will and executors there existed, and the administration with the will annexed was taken at their instance; but certain of the distributees residing in this country, the administrator was ordered to account and distribute here, not to transmit the surplus to the executors at the domicil. It is said 'elsewhere, by Justice Story, that whatever may be the form of administration in different countries upon the same estate, they are distinct and independent, because of the distinct and independent source from which they are derived, the power and jurisdiction which grants them, and to which they are accountable. In the case before us, however, the administrators were distinct and independent of each other in point of form, as well as in point of fact, and of legal liability. The administrator in each State, although not at first identical, became so, indeed, in the course of events. *239 But we apprehend, that circumstance can operate nothing as to the liability of defendants, Campbell and Bradford, the Tennessee sureties in the administration bond. Their liability under the operation of that circumstance is the same, not greater than if Taney had continued administrator in Missouri, and these specific chattels, the slaves, subject to the Missouri [administration, and upon which that had attached,, had subsequently been brought by William Keaton into Tennessee, and treated as assets by virtue of his Tennessee administration. In what situation would they have been in that case ? That question is answered by the case of Currie, adm’r, vs. Bircham, 1 Dow. & Ry. 32: where Bircham had money in his hands in England, the proceeds of effects, which had been in the hands of the administratrix in India, was sued by the English administrator on the same estate: It was held,' that the action would not lie; but that the foreign administrator, although of course, not in general entitled to sue in that character, could sue upon her own legal title. The same principle is recognised " in the case of Embray vs. Millar, 1 Alex. Mar. Rep. 304: 4 Littel, 277: 5 Monroe, 47: Story’s Confl. of Laws, 516-17-18-22. If then, in the case supposed, of Taney continuing administrator in Missouri, Keatpn the Tennessee administrator, had brought the negroes within this jurisdiction, the Missouri administrator could not in that character, indeed, but in his own legal title as trustee, have maintained here the action of detinue, or according to the course of our court of chancery with regard to property of that description, a detinue bill, as it has been called, and have recovered the possession of the negroes, and removed them to Missouri. But Keaton brought them here, they being assets in Missouri, and the administration granted by that jurisdiction having attached to, and appropriated them to be accounted for, in a course of administration there; he brought them here, and they were in his hands here, not indeed, in his character of Missouri administrator, but in his own legal right, and as trustee; under such circumstances, will the court here, permit him, in violation of his duty of administrator in Missouri, to convert these slave's into assets in Tennessee, so as to fix the sureties here with responsibility 1 This ought not to be done. 1st. In comity to the' State of Missouri. 2nd. In justice to the sureties here; for an account of the faithful administration of these very slaves in Missouri were the several bonds with *240 sureties mainly given in that State; and when in Tennessee or elsewhere, Keaton sold, or pretended to sell to himself the slaves in question, he violated his Missouri bond, and would, and could, and ought, there to be held responsible. The case to which we have already referred, in I Mason, establishes, that he could there be held to account, either to distributees or creditors, even if that had been in fact, in object, and in form, as it was not, an ancillary administration. But as it was distinct and independent, there was no more ground, or reason, for their throwing upon the Tennessee sureties the Missouri assets, than for throwing upon the Missouri sureties the Tennessee assets; and if that can be done, in either case, then, if there were twenty-six distinct and independent administrations in this confederacy by one, or many administrators, upon the same estate, it would be within the legal competency of the several principals and their sureties, by concentrating the assets upon one point, to throw the entire responsibilities upon one set of sureties; and this too, without furnishing the sufferers, ultimately, any chance for contribution, seeing that the transactions are distinct .and independent.
But it is said, that the defendants, the sureties, should be held liable in this case, because it is an acknowledged principle that the voluntary payment of a debt to a foreign administration, will discharge the debtor. And because goods employed in commerce, and in transitu, a ship, &c,, to the domicil, at the time of the death, although in a foreign port at the moment of that event, may properly be disposed of under the domestic administration. These cases stand upon their own grounds, and are very distinct from the present. The latter case of the transit of goods is placed by Mi’. Justice Story in his Conflict of Laws, upon grounds of strong public convenience, and indeed of unavoidable necessity, founded upon the nature of commerce, the ignorance of the death, &c., and the temporary interest of others in freight, &c.
Again: It has been said, that it has been not unusual for a foreign administration to be granted, where specific chattels have existed, but that the domestic administration often, in such cases, brings them home, and disposes of them in the course of the domestic administration. We have not that case before us, and, therefore, do not feel called on to say, that the sureties of the administrator would not be bound. We decide the case, before us, and *241 that only: that where a distinct and independent administration has been granted in the jurisdiction of the situs of the chattels or effects, and such jurisdiction has attached to them, they cannot then be brought into the administration here, so as to subject the surety. Again: It is said that the surplus is transmissible from the foreign administration. Yes; unquestionably, it is so ruled in many cases. But this means, where a suit in chancery has been brought at the instance of the proper persons, the condition of the estate at home and abroad enquired into and ascertained, creditors and distributees and others having been duly notified, and their claims satisfied, or waived, the court may transmit, by its act and order, such surplus, and all persons within their jurisdiction would, of course, be indemnified. Whether they would order it to be transmitted to the administrator himself, or to some judicial forum, where the parties in interest were accounting, and if to the former, whether it would subject his sureties, we care not to speculate.
The case in 5th Mason, relied on, as fixing the liability of the sureties, was a case, where the foreign administration was in its very terms and on the face of it, subordinate, and for the use and benefit of the American executor. But in that case, on other grounds, the sureties were held not to be liable, so that, in fact, there was no decree against him. But see the case of Hooker vs. Olmstead, 6 Pickering, 481.
Upon the whole, we are of opinion, that the complainants must seek their remedy against the administrators in the Missouri jurisdiction, where it happened, both he and the property in question, were at the institution of this suit, and that the sureties for the administration here, are not, under the circumstances of this case, liable.